## IN THE UNITED STATES DISCTRIC COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

        Plaintiff,

    v.

RACHAEL O'BRIEN, MORBID: A
TRUE CRIME PODCAST LLC d/b/a
MORBID NETWORK, WONDERY,
LLC, and AMAZON.COM, INC.,

        Defendants.

Case No.   CV 521-022

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DEFAMATION

Plaintiff Dr. Mahendra Amin, M.D. hereby states his complaint for

defamation against Defendants Rachael O'Brien, Morbid: A True Crime Podcast

LLC d/b/a Morbid Network, Wondery, LLC, and Amazon.com, Inc. as follows:

## INTRODUCTION

1.     Dr. Amin has practiced medicine for over 35 years, providing care to

underserved communities, and is the only OB/GYN physician in his home county

in a rural, southern area of Georgia.

2.     In addition to treating patients at a local health clinic on a voluntary

basis and providing care at area jails where other physicians are scarce, from 2017

until 2020, Dr. Amin provided gynecological medical services at his office and the

Irwin County Hospital to patients detained by the United States Immigration Customs Enforcement ("ICE") at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia.

3.     Around September 15, 2020, the media began reporting allegations, brought by an advocacy organization that sought to abolish ICE and close down ICDC, that women detained by ICE at ICDC had been subjected by Dr. Amin to high numbers of hysterectomies without informed consent.  This coverage resulted in mental pain and suffering, the loss of patients, and public hatred and ridicule directed toward Dr. Amin and other staff members at his office.

4.     The allegations, particularly of high numbers of hysterectomies, were discredited almost immediately, with ICE issuing a statement noting that Dr. Amin had only referred two patients detained by ICE at ICDC for medically necessary hysterectomies.

5.     Indeed, the United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs investigated and, in November of 2022, issued a report which concluded that allegations of "'high rates' of unauthorized hysterectomies on ICDC detainees" were false.

6.     Regardless, on April 16, 2023, several months *after* the Senate report and attendant media coverage found that the allegations of high rates of

hysterectomies were false, Defendants published a podcast entitled, "Seven Deadly Sinners, Episode 142: The Uterus Collector."

7.    As the title indicates, the episode falsely accuses Dr. Amin of being an abusive physician who performed mass hysterectomies and sterilization on women detained by ICE at ICDC.

8.    The false and defamatory statements, flatly contradicted by the Senate report, factual evidence, and other reporting, attacked Dr. Amin's character, accused him of despicable crimes, and damaged his reputation as a physician.

## PARTIES

9.    Dr. Amin is an individual who resides in Douglas (Coffee County), Georgia.

10.    Rachael O'Brien is an individual who, upon information and belief, resides at 79360 Citrus, La Quinta, Riverside County, California 92253 and sometimes at 31875 County Rd 53.7, Aguilar, Las Animas County, Colorado 81020.  Ms. O'Brien's business, Applause Breaks, Inc., is located at 79360 Citrus, La Quinta, Riverside County, California 92253.

11.    Morbid: A True Crime Podcast, LLC ("Morbid LLC") is a Massachusetts limited liability company.  Upon information and belief, Morbid LLC is doing business as "Morbid Network," a podcast network including "Seven Deadly Sinners," which is hosted by Ms. O'Brien.

12.     Wondery, LLC ("Wondery") is a Delaware limited liability company. Wondery is a podcast publishing company based out of Culver City, California. Wondery publishes Morbid Network, including the "Seven Deadly Sinners" podcast.

13.     Amazon.com, Inc. ("Amazon") is a technology and media conglomerate incorporated in Delaware and headquartered in Seattle, Washington. Amazon owns Wondery.

## JURISDICTION AND VENUE

14.     Dr. Amin is a citizen of the State of Georgia for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

15.     Ms. O'Brien is a citizen of California or Colorado for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

16.     Morbid LLC is a citizen of Massachusetts for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

17.     Wondery is a citizen of Delaware or California for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

18.     Amazon is a citizen of Delaware or Washington for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

19.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between Dr. Amin

and the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.    Defendants are subject to the jurisdiction of this Court because they caused a tortious injury in this state and Defendants regularly do or solicit business in Georgia and engage in a persistent course of conduct in Georgia.

21.    Specifically, Defendants caused tortious injury to Plaintiff through the false and defamatory statements about Dr. Amin in a podcast episode and description.

22.    Defendants regularly do and solicit business and engage in a persistent course of conduct in Georgia in the form of publishing podcasts that are available to Georgia listeners, and by soliciting and obtaining subscribers through an interactive web site available in Georgia.

23.    Upon information and believe, Defendants have a substantial community of listeners and subscribers, including paying subscribers, in Georgia.

24.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Dr. Amin's claim occurred in this district.

25.    In the alternative, venue is proper in this Court under 28 U.S.C. § 1391(b)(3) because at least one defendant is subject to its personal jurisdiction.

## FACTUAL BACKGROUND

### Dr. Amin

26.    Dr. Amin was born, raised, and completed medical school in India.

27.    Dr. Amin grew up very poor, living in homes with dirt floors.  But his parents sacrificed to help him through medical school.  His parents sold the only land they owned and borrowed money to make sure he could finish his education.

28.    Dr. Amin lived up to his parents' sacrifice, becoming one of only eight out of 300 medical student hopefuls from his district in India who could ultimately enroll in medical school.

29.    When he first came to the United States, he worked in a New York City subway store and sold newspapers in Brooklyn, working 12 hours a day, six days a week, all while studying for additional medical exams required of foreign students.

30.    He completed his Residency in Gynecology in the United States and has been licensed to practice medicine in Georgia for over 35 years.

31.    Dr. Amin remembers his humble beginnings and the power of someone sacrificing so that others can have a better future.  He is also keenly aware of the problems facing patients in largely rural areas and in healthcare and hospital deserts.  That is why he has practiced in underserved areas nearly his entire medical career.

32.   Dr. Amin is the sole OB/GYN physician in Irwin County, Georgia.

33.   Dr. Amin loves this country and all it has afforded him, and he is determined to give back.

34.   He is devoted to medicine and to providing care to underserved communities.

35.   Concrete evidence of Dr. Amin's principles is not hard to find.  For instance, in the early to mid-1990s, Irwin County Hospital was on the brink of closing its doors.  Dr. Amin put up his own money, hired a management team, and kept the hospital alive.  The hospital improved with Dr. Amin's leadership—adding more patient rooms and completing several other upgrades.

36.   Over the course of his medical career, Dr. Amin has regularly worked 36-hour shifts, seen over 60 patients in a day, and delivered over 400 babies in a year.

37.   He has often worked for free and for many years, he kept regular daily office hours and performed hospital surgeries at night, all to ensure—as much as he could prevent it— that no one who needed care would go without.

38.   Dr. Amin has not taken a vacation in over 25 years.

39.   On his rare weekends away, he remains "on call" and instructs his nursing staff to call him if any of his patients go into labor so that he can return and deliver the babies and care for their mothers.

40.     He regularly treated patients in area jails because he knows that if he does not provide treatment, it is likely the patients will go without.

41.     Dr. Amin provides medical care to patients at a local health clinic at least once per week on a volunteer basis.

42.     Many, if not most, of Dr. Amin's patients fall below the poverty line and are on Medicaid.

43.     Dr. Amin also regularly treats uninsured patients (some who drive over 100 miles to see him) and accepts whatever patients can pay in return.

44.     He never turns away a patient for inability to pay.

### Rachael O'Brien

45.     Ms. O'Brien is an entertainer who has previously worked as an actress and a touring comedian.

46.     Ms.  O'Brien rose to prominence as a romantic partner and friend of the stars of the popular reality television show "Vanderpump Rules," though she does not seem to have appeared on the show in several years.

47.     In 2020, Ms. O'Brien began publishing the "Seven Deadly Sinners" podcast, which she describes as a "hellish journey of deception all under the guise of Faith."[1]

---

[1] See https://wondery.com/shows/seven-deadly-sinners/ (last visited March 18, 2023).

48.     Seven Deadly Sinners has approximately 200 episodes, focusing on people she labels "Sinners," and characterizes as follows: "people who believe they deserve every little thing they desire, and hurting others along the way…well that's just road kill [sic]."[2]

49.     Seven Deadly Sinners is published with the podcast network Morbid Network through Wondery.com.

50.     From December 2022 through July 2023, Ms. O'Brien hosted another podcast called "Deadly Diocese" about the death of a priest in the Buffalo, New York diocese.  Deadly Diocese is also published with the Morbid Network through Wondery.com.[3]

## Morbid LLC and Morbid Network

51.     In 2018, Morbid LLC launched a podcast called "Morbid: A True Crime Podcast," an anthology series covering "true crime, creepy history, and all things spooky."[4]

52.     The podcast's success led its two hosts to create the Morbid Network.

53.     There is no single definition of the term, but a podcast network is generally a company or entity that produces or distributes multiple podcasts

---

[2] Id.

[3] See https://wondery.com/shows/deadlydiocese/ (last visited March 19, 2024).

[4] https://wondery.com/shows/morbid-a-true-crime-podcast/ (last visited March 18, 2023).

through the single umbrella entity.   As a business relationship with podcast creators, the network offers production support and guidance, audience metrics, and advertising and marketing services, typically in exchange for a portion of a podcast's revenue or ad sales.

54.    Podcast networks can be large or small and can operate within various levels or sub-networks depending on the multiple factors such as the services offered, target audiences, or similarities in theme.

55.    Morbid Network has partnered with creators to build a family of 13 podcast series=, including Seven Deadly Sinners (and Deadly Diocese).

56.    Seven Deadly Sinners is identified as part of the Morbid Network in multiple ways.  For instance, the show's thumbnail image includes the Morbid Network's trademarked logo.[5]

57.    Seven Deadly Sinners is identified as under the "Morbid" umbrella on its own home page on Wondery.com and also on the Morbid Network's homepage on Wondery.com.[6]

58.    The first words heard in episodes of Seven Deadly Sinners, starting from its premiere on June 29, 2020, are, "You're listening to a Morbid Network Podcast."

---

[5] See screenshot, ¶ 101, below.

[6] See https://wondery.com/morbidnetwork/?lg=en (last visited March 19, 2024).

59.     Morbid Network engages in substantial cross-promotion.

60.     For example, Ms. O'Brien has appeared as a special guest on other Morbid Network podcasts.  For instance, on January 27, 2021, Ms. O'Brien appeared on the Morbid Network podcast "Cult Liter with Spencer Henry," who described Ms. O'Brien as a friend and "Morbid Network Partner."

61.     On October 16, 2022, Ms. O'Brien appeared on the Morbid Network podcast Alone at Lunch.

62.     Ms. O'Brien also appeared with the two hosts of Morbid Podcast and founders of the Morbid Network on The Strange and Unusual Podcast in February 2021.  The episode's description encourages its audience to "[t]ake a listen and fall in love with more of the Morbid Network family!"[7]

**Wondery**

63.     Wondery is a podcast network and publisher founded in 2016.

64.     Wondery is one of the largest podcast networks in the country and is consistently ranked in the top 3 by industry analysts.

65.     Wondery's podcasts have attained critical and commercial success, earning numerous awards and large audiences.   Several Wondery podcasts have been turned into television programs.

---

[7] See https://wondery.com/shows/the-strange-and-unusual-podcast/episode/10873-morbid-network-presents-a-chat-with-rachael-obrien-from-seven-deadly-sinners-special-episode/ (last visited March 25, 2024)

66.     Wondery touts its "specialized marketing capabilities," "in-house monetization solutions," and "strong relationships with key distribution partners" as benefits to creators or other podcast networks considering paying for its services.

67.     As described more fully below, in 2022 Wondery and Amazon entered into an exclusive distribution and merchandising agreement with Morbid Network.

**Amazon**

68.     Amazon is a global conglomerate with substantial activities in Georgia.

69.     In 2020, Amazon, as Amazon Music, agreed to purchase Wondery for a reported $300 million.

70.     The deal closed in early 2021.  Wondery now operates out of Amazon's offices at 9300 Culver Boulevard in Los Angeles.  This building is part of the hundreds of thousands of square feet Amazon has purchased or leased for its media and production services, including Amazon Studios.

71.     Amazon Music is not registered as a business entity in California, Washington, or Delaware.  Rather, Amazon Music seems to be in essence a d/b/a or trade name of Amazon.com, Inc.

72.     Upon information and belief, Amazon Music's offices are in or near Amazon's 9300 Culver Boulevard building along with Wondery, Amazon Studios, and other Amazon business offices.

73.     Amazon and Wondery have an exclusive deal with Morbid Network. Pursuant to this deal, Amazon and Wondery have exclusive rights to Morbid Network's ad sales, merchandising, and distribution.  Amazon and Wondery also have a "windowing deal," meaning there is a "window" during which new Morbid Network context is available exclusively through Wondery and Amazon before it is available on the broader podcast market.

74.     Further, Morbid Podcast and Seven Deadly Sinners have Instagram pages, but the only official web pages for Morbid Podcast or the Morbid Network podcasts, including Seven Deadly Sinners, are on Wondery.com.

75.     Official Morbid Network merchandise is available only through Wondery.com.

76.     In short, Wondery and Amazon are the online home of the Morbid Network and Seven Deadly Sinners.

77.     This opportunity is not available to any podcast creators or networks. Rather, upon information and belief, creators or networks must either be approached by Wondery and Amazon or must apply to Wondery and Amazon to become part of their network.

13

78.     For instance, Wondery's web site permits podcast creators to "submit a request" to partner with the Wondery Network, which requires providing Wondery and Amazon with information including the podcast's "average 60-day downloads per episode."

## Project South's Media Campaign

79.     On September 14, 2020, Project South, a non-profit organization that portrays its mission as "eliminating poverty and genocide" and "cultivating strong social movements," sent a letter to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC (the "Letter").

80.     The Letter was not part of a complaint filed in any court or submitted as part of any administrative proceeding.

81.     Dawn Wooten, the alleged source of the information contained in the Letter, did not seek to be anonymous and did not seek any other protections that could be afforded to true whistleblowers who file formal complaints.  Instead, she sought the limelight.  She has also created or benefitted from multiple GoFundMe campaigns that have raised tens of thousands of dollars.

82.     The Letter did not identify Dr. Amin.

83.     The Letter contained allegations regarding conditions at the ICDC, mostly relating to COVID-19.  The Letter also contained allegations of high rates of hysterectomies at the ICDC.

84.     Instead of waiting for an investigation into the allegations, Project South immediately worked to sensationalize the contents of the Letter by sharing it widely with the news media.

85.     The media aired various stories about Dr. Amin beginning on or about September 14, 2020.

86.     Only one day after the Letter was sent—and years before the false and defamatory podcast episode underlying this suit—it was revealed that (a) allegations of mass hysterectomies were not based on first-hand accounts and were shared in the Letter only for prurient effect; and (b) ICDC and Irwin County Hospital confirmed that Dr. Amin had performed only two hysterectomies on ICDC patients.

**Government Investigations and the Senate Report**

87.     Even though the Letter was immediately revealed to be based on hearsay and sensationalized second-hand reports, the allegations of hysterectomies led to multiple investigations.

88.     The allegations were thoroughly investigated by myriad government entities, including the Department of Homeland Security Office of Inspector General, the United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs, the Georgia Composite Medical Board, and the Department of Justice, none of which have

substantiated the allegations regarding mass hysterectomies or sought to punish Dr. Amin.

89.     Currently, only the Department of Justice's investigation appears to remain open, but it has notably been over three years since the original allegations, and no charges have been made.

90.     Rightfully appalled by the accusations, Dr. Amin has cooperated with the investigations and helped them ascertain the truth.

91.     For instance, the Georgia Composite Medical not only concluded that the allegations were unsubstantiated and permitted him to continue practicing, but thanked Dr. Amin for his cooperation.

92.     In November 2022, the United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs issued a report (the "Senate Report"), finding that allegations of "'high rates' of unauthorized hysterectomies on ICDC detainees" were false.

93.     Indeed, the Senate Report unequivocally rejected the allegation that Dr. Amin had performed high numbers of hysterectomies, stating: "The Subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees.  Records indicate that Dr. Amin performed two hysterectomies on ICDC

detainees between 2017 and 2019.  Both procedures were deemed medically necessary by ICE."

94.    Moreover, in both instances, the patients were informed and consented to the procedures.  In both instances, ICE conducted an independent review of the treatment plans and approved the procedures.  In both instances, experts reviewing the procedures after-the-fact agreed that the procedures were necessary—and one even "life-saving."

95.    At most, the Senate Report stated that there "appeared" (based only on statistical comparison to other ICE facilities) to be excessive gynecological treatment and failures to secure informed consent.

96.    In fact, these statements regarding non-hysterectomy gynecological treatment and failure to obtain informed consent are contradicted by medical records and testimonial evidence.

### Publication of "The Uterus Collector"

97.    On April 16, 2023, Ms. O'Brien, Morbid LLC, Wondery, and Amazon published Seven Deadly Sinners, Episode 142 (the "Podcast Episode").

98.    In keeping with the Defendants 2020 agreement, upon information and belief, the Podcast Episode was exclusively available on Wondery and Amazon for one week.

99.    This episode contains numerous false and defamatory statements about Dr. Amin, beginning with the very title: "The Uterus Collector."

100.    The description of the Episode, posted on Seven Deadly Sinner's homepage on Wondery.com, is: "This one is so diabolical I almost didn't believe it myself until I started researching. And researching. And finding dozens upon dozens of articles and videos from all over the world describing the evil sins this man committed to the bodies of women without their consent — and sometimes without their verbal understanding. And trigger warning — this episode will deal with descriptions of unfathomable gynecological abuse."

101.    Below is a screenshot of the Podcast Episode's page on Wondery's web site:



102.   Throughout the Podcast Episode, Defendants published numerous other false and defamatory statements about Dr. Amin.

103.   Ms. O'Brien described the practices alleged in the Letter—which, by this point, had been discredited by no less than the United States Senate, as a form of discriminatory eugenics:

> Eugenics…This movement, it embraces eliminating undesirable genetic traits through selective breeding. We're talking forced sterilization.
>
> Eugenics resulted in men being sterilized to treat aggression and criminal behavior, while women were sterilized to control their sexuality or reproduce less desirable members of society.
>
> According to an article from the University of Washington, those with undesirable traits were identified as nonwhite, of lower economic status, or were physically or mentally disabled. In addition, criminals and those that were deemed sexually deviant were considered undesirable.

104.   Ms. O'Brien later explicitly linked Dr. Amin to this charge of eugenics:

> A five-page report was submitted to members of Congress alleging that both Dr. Amin and the referring detention facility took advantage of the vulnerability of women in detention to pressure them to agree to overly aggressive, inappropriate, and unconsented medical care. The women affected, it's worth noting, were mostly Black, or Latino, from Africa, Latin America, or the Caribbean. Again, this is where the eugenics comes into question. What was Dr. Amin's motive? His goal?
>
> Hey, you don't sound white either, buddy. What are you doing here? What's the plan? Power? Pride? Is it your sick pride?

105.   Ms. O'Brien made the following false and defamatory statement:

19

Whistleblowers began reporting abuse to the highest levels of government. This is how deep this story goes. And it involves innocent immigrant women detained in ICE facilities and one gynecologist hell bent on sterilization.

106.   Underscoring her bias and that she was stating the disproven allegations as fact, O'Brien said, "This is perhaps one of the most horrific cases I have ever researched. And that's saying a lot."

107.   Defendants republished many false and discredited allegations, embellished with Ms. O'Brien's own false and defamatory commentary:

[Dawn Wooten] alleged that a medical professional there basically took the uterus of nearly every woman she came across in recovery rooms at the facility. She was so disgusted by what she saw that her complaints were filed as part of a 27-page whistleblower complaint to the Department of Homeland Security Inspector General through the whistleblower advocacy group, the Government Accountability Project. And thank goodness she did. She felt compelled as a nurse to report what she was seeing, the horrific and inhumane treatment of innocent immigrant women.

But this document also mentions complaints from immigrant women at this particular facility regarding the sheer number of women at the Irwin facility undergoing hysterectomies.

But the hysterectomies, were those accusations thrown in by a disgraced, demoted employee actually true? Those in positions of authority in the facility feigned doubt or willingly turned a blind eye until victims started coming forward in September of 2020.

Detainees were not receiving adequate information to consent in a full, informed manner to hysterectomies, sterilization, reproductive surgery procedures and that hysterectomy, sterilization, reproductive surgery procedures were being performed unnecessarily on patients who could have been treated using other noninvasive methods.

20

It came when women inmates at the Irwin County Detention Center began approaching her asking about mysterious surgical procedures they were getting that they did not fully understand.

They would leave, go get treatment, and they would return back to the facility to be monitored. They would talk about the incisions that they have had or would have on the abdomen laparoscopically. And they realized that there was invasive procedures that were done.

Wooten began looking up their records. What she found was astonishing. She says a doctor was performing life changing surgeries on the women that they say they didn't want or properly consent to.

What procedures were they doing?  Hysterectomies and tubal ligations and tubal removals. Ovary removals. D&Cs.

So you're saying that physicians were sterilizing these women without their permission and unbeknownst to them?

Her records do not include a signed consent form. She had no idea what she was going under anesthesia for. Sorry, that just made me cry. Because, you know, as a woman that wants to have kids, that is so fucked up. Sorry for the language. Happy Easter. Anyhoo. Women were also referred to Dr. Amin for non-gynecological complaints like hernias or rib pain. And these women were often pressured into having surgeries that either weren't necessary or that they never consented to, according to the report. And heaven forbid they say no or retaliate, because oftentimes Dr. Amin would send these patients for psychiatric evaluation if they did.

This guy is a monster.

What could the motivation be in all of this, though, if it is, in fact, true? I believe it's true. Are we really talking eugenics or is it greed? Is he making money off of this? In my research, it has become clear that the Homeland Security Department pays independent doctors for procedures they perform on patients in such facilities. Great. So that makes everything done at ICE facilities super legit then. Oof! This is rough.

[One woman] then underwent a procedure. We don't know if she had given her consent or knew what she was going in for and said that when she awakened she was told her fallopian tubes were damaged and no good, and he let me know, I'm never going to be able to have kids. I was crushed. I was hearing and some of the stories they were saying that he was removing women's tubes without their permission. I thought, what if he just removed my tubes?

Cherise is still unclear what the doctor may have done to her during her surgery. She said, "I thought, I don't think I want him to touch me. Because we're immigrants, they just did whatever they wanted to do with us."

Another patient named Wendy woke up after surgery with bandages on her stomach and had to ask the medical office what kind of surgery she had had. Later, when she refused to get a hysterectomy, she recalled Dr. Amin asking her, "How many kids you got? Well, I don't see why you can't take it out." He's cool.

Many of the women weren't given access to their medical records, perhaps as retaliation for their complaints. Many of the records obtained were incomplete or inaccurate, with a number of the surgeries performed not recorded correctly, if at all. Because of this, many women don't have a clear picture of what might have been done to them. It's just horrifying. To not have the money to be able to also get a scan done to know what was done on your body, to see which part may no longer be there is just an absolute unethical, illegal criminal, scumbag nightmare.

108.   Through the Podcast Episode, Defendants also republished other false and defamatory comments from other media broadcasts, again peppered with Ms. O'Brien's own false and defamatory additions.  For instance, the Episode featured this MSNBC clip:

We've been chasing this story all day along some of my colleagues here at NBC. Tonight, we can report a lawyer named Benjamin Osorio, representing women at that very facility, told NBC News that, indeed,

two of his clients received hysterectomies they believe may have been unnecessary. And tonight we here on All Ends spoke with another attorney who represents two different women who claim they also had unnecessary hysterectomies while detained at this facility. That lawyer tells us that as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."

Of course, the "referred" is the question here.

109.   Incredibly, Ms. O'Brien even referenced the very Senate Report that concluded there was no merit to the mass hysterectomy allegations, but she made no statement whatsoever about the Report's conclusions in this regard.

110.   Instead, Ms. O'Brien doubled down on the sensational allegations:

According to the records that were found and released, they were being sterilized without consent. And in my mind, I'm going to, this can't be happening. I don't see what I see. I can't be observing what I see. This can't be the same for just about every chart. What is really going on? was the question that I asked myself.

A 60-page document was then presented to the politicians that alleged that Dr. Mahendra Amin, the primary gynecologist at the facility, coerced them into having overly aggressive or medically unnecessary surgeries, in most cases without their consent.

The surgeries of at least 19 of the women at Irwin specifically included the removal of their reproductive organs—uterus, ovaries, fallopian tubes—without the patient's consent.

A report written by a team of nine board-certified OB GYNs and two nursing experts affiliated with the academic medical centers such as Baylor College of Medicine and Northwestern University, not only detailed but supported the women's allegations. And these medical experts poured over more than 3200 pages of what was saved from the shredder, medical records obtained for these women, including pathology and radiology reports, prescriptions, consent forms,

telephone interviews, sworn declarations, and the like. And in all of these thousands of pages of records for these women—I can't even make sense or fathom this—they only found one signed consent form in English from a woman whose primary language was Spanish. Did she know what she was signing? Did she have an interpreter? It makes me so sick. It's—it's beyond unethical. It's criminal.

111.   Ms. O'Brien took further potshots at Dr. Amin that made it clear she was asserting that the allegations were factually accurate.  For example, she said, "And if you're in the market for a new gynecologist, his office is currently accepting new patients. I think that's scary."

112.   Ms. O'Brien also said that Dr. Amin "chained" his patients.

113.   The Podcast Episode's allegations about ICDC and Dr. Amin concluded with this statement: "One thing is for sure: the atrocities committed at this facility are beyond comprehension."

114.   Through these and other statements, Defendants accused Dr. Amin of performing mass hysterectomies that were not medically necessary on ICDC detainees and of otherwise abusing his patients.

115.   In the Podcast Episode, Defendants published numerous false and defamatory statements without any investigation into the truth or falsity and in the face of contradictory information already known at the time the Podcast Episode aired and, most likely, even at the time the Podcast Episode was recorded.

116.   Defendants never spoke to Dr. Amin about the contents of the Podcast Episode.

117.   Defendants were not interested in the truth; they were interested in the shock value of the allegations as a method of drawing attention to their podcasts.

118.   It is beyond reasonable belief that detainees in an ICE facility, such as ICDC, could undergo surprise hysterectomies without consultation and consent.

119.   ICE performs an independent review for all surgical procedures and issues its approval or denial for such procedures.

120.   This review process requires an ICDC nurse and an independent physician to review a patient's medical records and determine if the requested procedure is medically necessary.  The process typically takes around two weeks.

121.   Dr. Amin has never performed a procedure on an ICDC patient without going through this process.

122.   ICE provided such review and approval for both hysterectomies that Dr. Amin performed on ICDC patients.

123.   An independent physician review of those procedures confirmed that the procedures were medically necessary, and that the procedures were discussed with and consented to by both patients.

124.   Dr. Amin always obtains informed consent from his patients.

125.   Dr. Amin utilizes interpreters when treating patients who do not speak or understand English.

126.   When Dr. Amin treated ICDC patients, he was accompanied by at least one other person.  This was a matter of protocol.

127.   Dr. Amin has never treated any patient inappropriately.

128.   Further, by the time Defendants published the Podcast Episode, the allegations had been repeatedly discredited.

129.   By the time Defendants published the Podcast Episode, the Senate Report had concluded, after investigation, that Dr. Amin had not performed mass hysterectomies of any kind, and that the two hysterectomies he had performed for women at ICDC were medically necessary.

### Damages

130.   Dr. Amin's personal reputation and his reputation as a physician have been damaged by the false and defamatory statements in the Podcast Episode.

131.   Further, Dr. Amin has suffered stress, emotional distress, embarrassment, humiliation, anger, and other mental pain and suffering.

132.   Dr. Amin has also suffered public hatred, contempt, scorn, and ridicule.

133.   Dr. Amin has been the recipient of multiple vile and hateful telephone calls that no person should have to endure.

134.   Dr. Amin continues to fear for his safety.  He fears that people are following him and talking about him in public.

135.   Dr. Amin has also withdrawn from social and community activities he previously enjoyed.

## CAUSE OF ACTION FOR DEFAMATION

136.   Dr. Amin incorporates by reference paragraphs 1-135 of this Complaint as though the same were set forth herein in their entirety.

137.   Defendants' April 16, 2023, Podcast Episode contains numerous false and defamatory statements.

138.   Defendants' web page for the April 16, 2023, Podcast Episode also contains false and defamatory statements about Dr. Amin.

139.   The Podcast Episode was published to third parties and available for third parties across the United States and around the world to listen and read, and third parties did listen to the Podcast Episode and read its description and transcript.

140.   For instance, the Podcast Episode is available through other audio services including Apple Podcasts and Spotify.

141.   The Podcast Episode is of and concerning Dr. Amin, because, among other reasons, Defendants identified Dr. Amin by name, profession, and location.

142.   Specific false and defamatory statements from the Podcast Episode include that Dr. Amin: (i) was an "unethical, illegal, criminal, scumbag

nightmare;" (ii) was "hell-bent on sterilization;" (iii) engaged in eugenics; and (iv) committed "horrific and inhumane treatment of innocent immigrant women."

143.   The written description of the Podcast Episode also included false and defamatory statements, such describing Dr. Amin's medical care as "evil sins this man committed to the bodies of women without their consent."

144.   Dr. Amin performed only two hysterectomies on ICDC patients.  Both were medically necessary.

145.   The Podcast Episode is defamatory per se so damages as to Dr. Amin are presumed as a matter of law.

146.   The gist of the Podcast Episode is false and defamatory *per se* because it conveys accusations that Dr. Amin is an unethical and dishonest physician with no regard for the safety and well-being of his patients, and that he actively and intentionally sought to hurt them.

147.   For instance, the Podcast Episode accuses Dr. Amin of being "hell-bent on sterilization" and of engaging in eugenics.

148.   The Podcast Episode is defamatory per se because it injures Dr. Amin's professional reputation.

149.   For instance, the Podcast accuses Dr. Amin of treating his patients in a "horrific and inhumane" manner and of sterilizing patients without their consent.

150.   The Podcast Episode is defamatory per se because it accuses Dr. Amin of criminal activity.

151.   For instance, the Podcast Episode accuses Dr. Amin of chaining his patients and of performing mass hysterectomies without patient consent, which constitute battery under Georgia law.

152.   Defendants published the April 16, 2023, Podcast Episode without privilege.

153.   Evidencing a reckless disregard for truth or falsity, Defendants knowingly and purposely avoided the truth and ignored evidence establishing the falsity of the April 16, 2023, Podcast Episode prior to its publication.

154.   Evidencing a reckless disregard for truth or falsity, Defendants published the April 16, 2023, Podcast Episode, which contained statements that were so inherently improbable on their face as to raise serious doubts about their truth.

155.   Evidencing a reckless disregard for truth or falsity, Defendants published the April 16, 2023, Podcast Episode, which contained statements that were so outrageous on their face as to raise serious doubts about their truth.

156.   For instance, it is inherently improbable and outrageous that there was a plot to mass sterilize patients at ICDC or that ICE would permit or overlook unconsented mass hysterectomies.

29

157.   Evidencing a reckless disregard for truth or falsity, Defendants published the April 16, 2023, Podcast Episode, which contained statements that contradicted known facts.

158.   For instance, by April 16, 2023, the Senate Report concluding the mass hysterectomy allegations were unsubstantiated had been available for months.

159.   Defendants published the April 16, 2023, Podcast Episode without conducting a reasonable investigation.

160.   For instance, a reasonable investigation would have shown none of the multiple investigations into the allegations found them credible or substantiated.

161.   Defendants had actual knowledge that the accusations against Dr. Amin were false prior to publication of the April 16, 2023, Podcast Episode.

162.   For instance, the Podcast Episode references the Senate Report but omits any information about its conclusion that the mass hysterectomy allegations were wrong.

163.   Defendants negligently published the April 16, 2023, Podcast Episode.

164.   Defendants published the April 16, 2023, Podcast Episode with actual malice, that is, with actual knowledge of falsity or a reckless disregard for truth or falsity.

165.   Defendants are liable for damages for the April 16, 2023, Podcast Episode and for all republications of the April 16, 2023, Podcast Episode and its description.

166.   The April 16, 2023, Podcast Episode directly and proximately caused substantial and permanent damage to Dr. Amin.

167.   Dr. Amin has suffered special damages as a direct and proximate result of the April 16, 2023, Podcast Episode.

168.   Dr. Amin's personal reputation and his reputation as a physician have been damaged as a direct and proximate result of the April 16, 2023, Podcast Episode.

169.   Dr. Amin has suffered stress, emotional distress, embarrassment, humiliation, anger, and other mental pain and suffering as a direct and proximate result of the April 16, 2023, Podcast Episode.

170.   Dr. Amin has suffered public hatred, contempt, scorn, and ridicule as a direct and proximate result of the April 16, 2023, Podcast Episode.

171.   Dr. Amin has suffered emotional distress as a result of the April 16, 2023, Podcast Episode.

172.   Dr. Amin has also suffered damage to his business and medical practice as a result of the Podcast Episode.

173.   Because Defendants published the April 16, 2023, Podcast Episode with both Constitutional and common law malice, Dr. Amin is entitled to an award of punitive damages to punish Defendants for their wrongdoing and deter them from repeating such heinous conduct in the future against others.

174.   Defendants' conduct was willful and demonstrates that entire want of care that raises a conscious indifference to consequences.

175.   Notwithstanding all the information available, Defendants refused to retract or correct their defamatory statements.

176.   On August 7, 2023, Dr. Amin sent Defendants a letter identifying examples of the false and defamatory statements in the Podcast Episode and its description, and demanding Defendants retract the Podcast Episode and publish a correction of their false and defamatory statements.

177.   To date, however, the Podcast Episode and its description remain available to the public on Wondery, Amazon Music, and on other podcast-hosting platforms, including Apple Music and Spotify.

WHEREFORE, Dr. Amin demands:

(a)   Trial by jury;

(b)     That judgment be entered against Defendants jointly and severally for compensatory damages in an amount not less than Five Million Dollars ($5,000,000.00);

(c)     That judgment be entered against Defendants jointly and severally for punitive damages in an amount not less than Ten Million Dollars ($10,000,000.00) to punish and penalize Defendants and deter them from repeating his unlawful conduct;

(d)     That Dr. Amin's reasonable attorneys' fees and all costs of this action be assessed against Defendants; and

(e)     That this Court award such other relief as it deems equitable, just, and proper.

DATED: March 27, 2024.              Respectfully submitted,

 By:                              */s/ Stacey Godfrey Evans*


                                  Stacey Godfrey Evans
                                  Georgia Bar No. 298555
                                  sevans@staceyevanslaw.com
                                  Ryan E. Harbin
                                  Georgia Bar No. 370658
                                  rharbin@staceyevanslaw.com
                                  J. Amble Johnson
                                  Georgia Bar No. 229112
                                  ajohnson@staceyevanslaw.com

                                  STACEY EVANS LAW
                                  729 Piedmont Ave NE
                                  Atlanta, GA 30308

(404) 850-6750 (phone)
(404) 850-6748 (fax)

Scott R. Grubman
Georgia Bar No. 317011
sgrubman@cglawfirm.com

CHILIVIS GRUBMAN
DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

*Counsel for Plaintiff*