UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | |
| RACHAEL O'BRIEN, MORBID: A TRUE ) | FILE NO. 5:24-CV-00022-LGW-BWC |
| CRIME PODCAST LLC d/b/a MORBID ) | |
| NETWORK, WONDERY, LLC, and ) | |
| AMAZON.COM, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANT MORBID: A TRUE CRIME PODCAST LLC'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

Defendant Morbid: A True Crime Podcast LLC ("Morbid") moves to dismiss Dr. Mahendra Amin's Complaint for lack of personal jurisdiction. Under federal and Georgia law, this Court must determine whether exercising jurisdiction (1) is appropriate under the state long-arm statute, and (2) does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The threadbare Complaint does not plead a single fact showing that Georgia has personal jurisdiction over Morbid. Instead, it wrongly lumps the four defendants together, never specifies any defendant's relevant individual circumstances, and thus fails to meet the constitutional requirement that, to establish personal jurisdiction, each defendant's contact be assessed individually. Moreover, such assessment establishes that Morbid is headquartered in Massachusetts and has no ties to Georgia. Exercising personal jurisdiction over Morbid would therefore be improper under the long-arm statute and violate due process. Accordingly, Morbid respectfully requests that this Court dismiss the Complaint against Morbid.

1

I. **FACTUAL BACKGROUND**

A. **The Parties Relevant to this Motion.**

As alleged in the Complaint and taken as true only for the purpose of Morbid's Motion, Dr. Amin is an OB/GYN in southern Georgia. Compl. ¶ 1. From 2017 to 2020, Dr. Amin provided gynecological services to immigrant women detained by the United States Immigration Customs Enforcement ("ICE") at the Irwin County Detention Center ("ICDC"). Compl. ¶ 2.

Rachael O'Brien is an individual with whom Morbid contracted, as an independent contractor, to create and publish her podcast titled, *Seven Deadly Sinners*. Compl. ¶ 10; Ex. A (The Declaration of Ashleigh Nicole Cisek) ¶ 11. Ms. O'Brien records her podcast from Denver, Colorado. Ex. A ¶ 15.

Wondery is a Delaware limited liability company based in Culver City, California. Compl. ¶ 12. Wondery is a publishing company that publishes Morbid Network podcasts, including *Seven Deadly Sinners*. Compl. ¶ 12.

Morbid is a Massachusetts limited liability company and a citizen of Massachusetts for purposes of jurisdiction. Compl. ¶¶ 11, 16. Several podcasts are released under the Morbid Network brand. Compl. ¶¶ 51-53, 55; Ex. A ¶ 11. Everyone who releases a podcast under the Morbid Network brand signs an independent contractor agreement. Ex. A ¶ 12. Morbid has no input or oversight authority whatsoever over the podcasts released under the Morbid Network brand. *Id* ¶ 14.

Morbid signed an exclusive distribution and merchandising agreement with Wondery. Compl. ¶67; Ex. A ¶ 16. Under this agreement, Wondery pays Morbid a set amount in exchange for exclusive rights to Morbid's ad sales, merchandising, and distribution. Compl. ¶ 73; Ex. A ¶ 16. Payment from Wondery is Morbid's only source of revenue. Ex. A ¶ 16. Wondery

exclusively handles selling ad slots on Morbid podcasts, and Wondery sells all Morbid-branded merchandise on Wondery.com or its Amazon storefront. Compl. ¶ 75; Ex. A ¶ 17. Morbid receives no direct revenue from listeners, is not involved with selling ad slots on its podcast, and does not handle or fulfill any merchandise orders. Ex. A ¶ 18.

The only official page for Morbid Network podcasts, including *Seven Deadly Sinners*, is on Wondery.com. Compl. ¶ 74; Ex. A ¶ 20. The only online page that Morbid controls is its Instagram account. Ex. A ¶ 19. Wondery is the "online home" of the Morbid Network and *Seven Deadly Sinners*. Compl. ¶ 76. Morbid does not control the content on the Wondery website. Ex. A ¶ 20. Morbid Network podcasts, including *Seven Deadly Sinners*, are uploaded on the Wondery platform where they are exclusively available to listeners for one week. Compl. ¶ 98; Ex. A ¶ 20.

### B. The Whistleblower Complaint.

On September 14, 2020, Project South, a nonprofit organization that advocates for immigrants' rights, filed a whistleblower complaint with the Department of Homeland Security, ICE, and ICDC on behalf of Dawn Wooten, a nurse at ICDC ("The Whistleblower Complaint"). Compl. ¶¶ 3, 79; Ex. B (The Whistleblower Complaint)[1]. The Whistleblower Complaint identified serious concerns about ICDC that Wooten and others harbored, including the high rate at which seemingly unnecessary hysterectomies and other gynecological procedures were performed on detainees by the facility's gynecologist without the women's full consent. Compl. ¶ 83; Ex. B. The Whistleblower Complaint states that the ICDC "sends many women to see a particular

---

[1] The Court may take judicial notice of relevant public documents at the motion-to-dismiss stage and may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity. *Ellison v. Postmaster Gen., United States Postal Serv.*, No. 20-13112, 2022 U.S. App. LEXIS 27555, at *19 (11th Cir. Oct. 3, 2022).

gynecologist."[2] Ex. B, pg. 18. One detainee reported speaking with five women who claimed they were "confused" about why they received hysterectomies, while "several" others did not understand "what they [were] getting done." *Id*. Another observed that ICDC felt like "an experimental concentration camp." *Id*. at 19.

The Whistleblower Complaint quoted Wooten as stating that "everybody [Dr. Amin] sees, he's taking all their uteruses out or he's taken their tubes out," and chronicled the experience of one detainee who was supposed to have her left ovary removed, but "he took out the right one" accidentally. *Id*. It also quoted another detainee who stated that, in three conversations, she received three contradictory explanations of the medical procedure she would be having, causing her to feel "scared and frustrated." *Id*. at 20. Wooten explained that women referred to the doctor as the "uterus collector" and opined "everybody's uterus cannot be that bad." *Id*. at 19.

Several government entities investigated the allegations, including the Department of Homeland Security Office of Inspector General, the United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs, the Georgia Composite Medical Board, and the Department of Justice. Compl. ¶ 88. None of these entities has substantiated the allegations of mass hysterectomies or sought to punish Dr. Amin. Compl. ¶ 88. The Department of Justice's investigation remains open. Compl. ¶ 89.

---

[2] The Whistleblower Complaint prompted immediate widespread media coverage which identified Dr. Amin as the doctor who was the "particular gynecologist" referred to in the Complaint. See Compl. ¶ 85. Much of that media coverage was published years before Ms. O'Brien published her "The Uterus Collector" episode.

### C. The *Seven Deadly Sinners* Podcast.

Ms. O'Brien is not Morbid. She is an independent contractor who publishes a podcast under the Morbid Network brand. Ex. A ¶¶ 11,12. Indeed, the contract between Ms. O'Brien and Morbid unequivocally confirms her status as an independent contractor. Ex. A ¶ 12. It states,

> The Parties' relationship is that of independent contractors. Nothing in this Agreement: … constitutes [Ms. O'Brien] or Host(s) as agents, legal representatives or employees of Morbid. … All financial and other obligations associated with the business of [Ms. O'Brien] are the sole responsibility of [Ms. O'Brien] ….

*Id*. Morbid has no control over the content she publishes, nor does it review or influence the topics of her episodes. Ex. A ¶ 14.

On April 16, 2023, Ms. O'Brien published an episode of her *Seven Deadly Sinners* podcast titled "The Uterus Collector." Compl. ¶ 97. In the episode, Ms. O'Brien discussed accusations against Dr. Amin that arose from The Whistleblower Complaint and the subsequent governmental and media investigations of its allegations. Compl. ¶ 107. Ms. O'Brien also featured audio clips from other news sources reporting the allegations, and excerpts from a report released by the United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs detailing its investigation into the allegations. Compl. ¶¶ 108-09.

### D. Facts Related to Jurisdiction.

Dr. Amin concedes that Morbid is a citizen of Massachusetts for jurisdictional purposes. Compl. ¶¶ 11, 16. Given this inconvenient fact, Dr. Amin does not genuinely attempt to show that Georgia has personal jurisdiction over Morbid individually. *See generally* Compl. Instead, Dr. Amin lumps Morbid with its co-defendants, and offers only the blanket allegation that Georgia has personal jurisdiction over "Defendants" because they:

- "[C]aused a tortious injury in this state and Defendants regularly do or solicit business in Georgia and engage in a persistent course of conduct in Georgia." Compl. ¶ 20 "Specifically, Defendants caused tortious injury to Plaintiff through the false and defamatory statements about Dr. Amin in a podcast episode and description." Compl. ¶ 21.

- "[R]egularly do and solicit business and engage in a persistent course of conduct in Georgia in the form of publishing podcasts that are available to Georgia listeners, and by soliciting and obtaining subscribers through an interactive web site available in Georgia." Compl. ¶ 22.

- "[H]ave a substantial community of listeners and subscribers, including paying subscribers, in Georgia." Compl. ¶ 23.

Dr. Amin does not allege any facts specific to Morbid to establish jurisdiction. For example, he does not allege that Morbid has bank accounts in Georgia (it does not), has offices in Georgia (it does not), has property in Georgia (it does not), has any business relationships in Georgia (it does not), targets Georgia with advertisements (it does not), has direct revenue from Georgia (it does not), or that the officers of Morbid have ever spent time in Georgia (they have not). Ex. A ¶¶ 6-9, 16-17.

## II.     DISCUSSION

### A. Legal Standard

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Id.* (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)).

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Mazer*, 556 F.3d at 1274.

In determining personal jurisdiction, each individual's contact with the forum must be evaluated individually, and the requirements of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) "must be met as to **each defendant** over whom a state court exercises jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (emphasis added). Considering the defending parties by group and aggregating their forum contacts in determining jurisdiction is "plainly unconstitutional." *Id.*

### B. The Georgia Long-arm Statute Does Not Authorize the Exercise of Personal Jurisdiction Over Morbid.

Because this is a diversity action brought against a nonresident of Georgia, this Court must initially look to Georgia's "long-arm statute," which defines the scope of personal jurisdiction that Georgia courts may exercise over nonresidents. *See* O.C.G.A. §§ 9-10-90 to 9-10-94; *Mazer*, 556 F.3d at 1274 (11th Cir. 2009). To satisfy the long-arm statute, the Court's exercise of specific personal jurisdiction must be permitted under one of the express statutory provisions, interpreted and applied literally. *McCarthy v. Yamaha Motor Mfg. Corp.*, 994 F. Supp. 2d 1318, 1323 (N.D. Ga. 2014).

In his Complaint, Dr. Amin does not identify a subsection of the statute that might apply. That said, the Complaint could only plausibly be construed to allege personal jurisdiction under one of the first three subsections of the statute, covering nonresidents who are tortfeasors and/or

7

engage in business transactions within the state.³ *See* Compl. ¶¶ 20-22. O.C.G.A. § 9-10-91(1)-(3) provides:

> A court of this state may exercise personal jurisdiction over any nonresident ... as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he: (1) Transacts any business within this state; (2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act; [or] (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business ... or derives substantial revenue from goods used ... or services rendered in this state.

Personal jurisdiction cannot be exercised over Morbid because none of these prerequisites is met by the facts of this case.

### 1. *Morbid Does Not Transact Any Business in Georgia.*

Pursuant to O.C.G.A. § 9-10-91 subsection (1), a nonresident tortfeasor may be subject to personal jurisdiction in Georgia if it transacts any business in the state, and if the exercise of jurisdiction does not exceed the parameters established to ensure constitutional due process. *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames*, 279 Ga. 672, 675 (2005). Accordingly, courts look to whether "(1) the nonresident defendant has purposefully done an act or consummated a transaction in Georgia, (2) the cause of action arises from or is connected with the act or transaction, and (3) the Georgia court's exercise of jurisdiction does not offend traditional fairness and substantial justice." *Sol Melia, SA v. Brown*, 301 Ga. App. 760, 763-64 (2009)

---

³ The other subsections, addressing real property and domestic relations matters, are not applicable and there is no indication from the pleadings that Dr. Amin intended to assert jurisdiction on such bases. *See* O.C.G.A. §§ 9-10-91(4)-(6).

(citations omitted). "Personal jurisdiction under subsection (1) of the long-arm statute is not appropriate when there is no evidence of purposeful activity directed at or within the state of Georgia." *Gulfstream Aero. Corp. v. Gulfstream Air Charter, Inc.*, No. 4:17-cv-26, 2018 U.S. Dist. LEXIS 197909, at *9 (S.D. Ga. Nov. 20, 2018).

As a threshold matter, Dr. Amin does not allege sufficient facts about Morbid specifically to confer jurisdiction. Instead, Dr. Amin groups the four defendants together in a futile attempt to satisfy all of the statute's requirements. Rather than specifying each defendant's contacts individually, Dr. Amin simply posits that, "Defendants regularly do or solicit business in Georgia and engage in a persistent course of conduct in Georgia." Compl. ¶ 21. But blackletter law makes clear that aggregating multiple defendants' forum contacts to satisfy jurisdiction is "plainly unconstitutional." *Rush*, 444 U.S. at 332 (1980); *Kendrick v. Parker*, 258 Ga. 210, 211 (1988) ("Each defendant's contacts with Georgia must be assessed individually."); *See VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 663 (N.D. Tex. 2020) (holding plaintiff's "conclusory, group allegation" was insufficient to make a prima facie case for personal jurisdiction and would violate the Constitution).

Dr. Amin's conspicuous failure to specify contacts as to Morbid is no accident of careless pleading. In truth, Morbid has no business ties with the state of Georgia. Ex. A ¶ 7. It has not entered any contracts with any Georgia residents. *Id*. It does not maintain any offices or agents in Georgia. *Id*. ¶ 6. It has never engaged in negotiations within Georgia or with any Georgia residents or corporations. *Id*. ¶ 7. Morbid does not receive revenue directly from any podcast listeners in Georgia or otherwise, as all revenue it receives is from Wondery. *Id*. ¶¶ 16-18. Wondery holds the exclusive right to sell ad slots on Morbid's podcasts; Morbid does not sell ads to Georgia businesses or otherwise. *Id*. ¶¶ 16-17. Indeed, Morbid's officers have never even visited Georgia

apart from driving through the state on the way to and from Florida. *Id*. at ¶ 9. Without any purposeful business act to tie Morbid to Georgia, the cause of action cannot arise from or be connected to an act or transaction taking place in Georgia, and subsection (1) of the long-arm statute cannot apply. *See Diamond Crystal*, 593 F.3d at 1260 (explaining that there must be "the actual transaction of business—the doing of some act or consummation of some transaction—by the defendant in the state").

Dr. Amin presents no other facts demonstrating Morbid's contacts with Georgia or that his claim relates to those contacts. At most, he alleges that Morbid Network podcasts are accessible to listeners in Georgia due to their availability on the internet. Compl. ¶ 22. But it is well-settled that podcast availability in the forum state alone is *not* sufficient to establish jurisdiction. *See Gulfstream Aero. Corp.*, 2018 U.S. Dist. LEXIS 197909, at *10-12 ("The operation of a website accessible in Georgia, and everywhere else, cannot alone constitute 'the actual transaction of business.'") (citing *Jordan Outdoor Enterps., Ltd. v. That 70's Store, LLC*, 819 F. Supp. 2d 1338, 1343-44 (M.D. Ga. 2011)). Notably, Dr. Amin does not allege – because he cannot – that Morbid engaged in any activity in Georgia to create or publish the podcast, other than making it available online. *Compare Cenegenics LLC v. Gaines*, No. 2:19-CV-1797 JCM (VCF), 2020 U.S. Dist. LEXIS 104071, at *8-9 (D. Nev. June 12, 2020) (no personal jurisdiction over podcast creators where plaintiff did not establish "the required affiliation between the defendants' contacts with Nevada and the present action" because it "[did] not allege that the maintenance of defendants' websites [took] place in Nevada… [or] that the defamation or disparagement, specifically the referenced podcast, took place in Nevada"); *with Doherty-Heinze v. Chrisley*, No. 3:21-cv-105-TCB, 2022 U.S. Dist. LEXIS 239683, at *16 (N.D. Ga. July 18, 2022) (finding subsection (1) of the long-arm statute was satisfied where podcast host used his

10

Georgia-incorporated company to publish his podcast and hired private investigators in Georgia to dig up intentionally disparaging information on plaintiff).

Dr. Amin also points to defendants' purported use of an "interactive website" to solicit subscribers in Georgia. Compl. ¶ 22. When analyzing specific personal jurisdiction based on online interactions via an internet website, Georgia uses the "sliding scale" first articulated in *Zippo Manufacturing. Co. v. Zippo Dot Com*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See, e.g.*, *Pascarelli v. Koehler*, 346 Ga. App. 591, 595 (2018). The sliding scale represents a continuum in which "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Pascarelli*, 346 Ga. App. at 595, quoting *Zippo*, 952 F. Supp. at 1124. In *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515 (2006), this Court adopted that sliding-scale mode of analysis, explaining:

> [A]t one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

Examining the "level of interactivity" here confirms that Morbid's actions are too far removed to confer jurisdiction. The only official web page for Morbid Network podcasts is hosted by Wondery. Ex. A ¶ 20. Morbid does not control, influence, or otherwise have any involvement with the Morbid Network webpages on the Wondery website. *Id*. Moreover, the website is of the utmost passivity because it effectively does nothing beyond making the podcast available to those

who are interested in it. *See Pascarelli*, 346 Ga. App. at 596; *Barton Southern Co. v. Manhole Barrier Systems*, 318 F. Supp. 2d 1174, 1177-78 (N.D. Ga. 2004) (finding nonresident defendant's semi-interactive website, which allowed customers to fill out order forms for goods but not complete transactions online, failed to support personal jurisdiction, in part, because there was "nothing on the website showing an intent to reach out to persons living in Georgia"). In sum, alleging only that a defendant made a podcast that was widely available online does not establish either the transactions in Georgia or the affiliation between the defendant's contacts with the state and the cause of action required to confer jurisdiction. Accordingly, O.C.G.A. § 9-10-91(1) cannot serve as Dr. Amin's basis for asserting personal jurisdiction over Morbid.

### 2. *Tortious Acts Committed Within Georgia by Nonresidents Are Subject to the Defamation Exception.*

To the extent Dr. Amin may claim that personal jurisdiction is based on Morbid's alleged tortious acts within Georgia, O.C.G.A. § 9-10-91(2) governs – but it explicitly excludes acts of alleged defamation. *See* O.C.G.A. § 9-10-91(2) (personal jurisdiction conferred as to nonresident who "[c]ommits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act"); *Worthy v. Eller*, 265 Ga. App. 487, 488 (2004) ("The language of the statute is clear, unequivocal and unambiguous in mandating the exclusion of an action predicated on defamation."). Accordingly, O.C.G.A. § 9-10-91(2) cannot serve as the basis for asserting personal jurisdiction over Morbid.

### 3. *Morbid Does Not Regularly Do or Solicit Business in, or Derive Any Revenue in Connection with Any Business with or in, Georgia.*

Dr. Amin likewise cannot rely on O.C.G.A. § 9-10-91(3) to establish personal jurisdiction over Morbid. Subsection (3) applies when the defendant "commits a tortious injury in this state caused by an act or omission outside [of Georgia] if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from

goods used or consumed or services rendered in [Georgia]." O.C.G.A. § 9-10-91(3). The defendant's contacts with Georgia must be repeated or consistent and fall into one of the categories of conduct listed. *See Bradlee Mgmt. Servs., Inc. v. Cassells*, 249 Ga. 614, 618 (1982); *Kyte Centrifuge, LLC v. Farr*, No. 3:22-cv-00095-TES, 2023 U.S. Dist. LEXIS 98505, at *14 (M.D. Ga. June 6, 2023) (dismissing claim where plaintiff "failed to allege that Defendant *regularly* does business or engages in any other persistent course of conduct in Georgia" (emphasis in original); *Doherty-Heinze*, 2022 U.S. Dist. LEXIS 239683, at *15-16 ("for purposes of the long-arm statute, the Court will consider a 'persistent course of conduct' as a constantly—and perhaps tenaciously—repeated or continued series of acts indicating a continuity of purpose"). This standard is thus more demanding than the general requirements of constitutional due process. *Bradlee*, 249 Ga. at 617.

As demonstrated in Section B(1) above, Dr. Amin does not allege – because Morbid does not have – the requisite contacts with Georgia for this subsection to apply. Morbid does not engage in business with Georgia at all, let alone regularly or persistently. The general availability of Morbid Network podcasts on a website is insufficient to confer personal jurisdiction in Georgia. *Gulfstream Aero. Corp.*, 2018 U.S. Dist. LEXIS 197909, at *13; *Polywad, Inc. v. Able's Sporting, Inc.*, No. 5:23-cv-00512-TES, 2024 U.S. Dist. LEXIS 74059, at *10 (M.D. Ga. Apr. 23, 2024) ("Plaintiff cannot establish personal jurisdiction on the idea that [defendant's] website … was merely accessible in Georgia."). Moreover, the subsection requires a heightened level of contact with the state, and Dr. Amin's sparse allegations against Morbid fall far short of the circumstances in which Georgia courts properly have found personal jurisdiction. *See, e.g.*, *Doherty-Heinze*, 2022 U.S. Dist. LEXIS 239683, at *16 ("persistent course of conduct" requirement satisfied where podcast host engaged in an extensive campaign to harm plaintiff,

"repeatedly reached out to the state and its citizens for information regarding [plaintiff]" and "repeatedly recruited and solicited Georgia contacts through his podcast and his social media … [and] even directed fans to lodge complaints against [plaintiff]," admitting that his "goal was for [plaintiff] to be criminally prosecuted"). In stark contrast to the facts found sufficient in *Doherty-Heinze*, Morbid has not committed or performed a single purposeful act to tie itself to Georgia and, given the passivity of Wondery's website, lacks even minimum contacts. The more rigorous jurisdictional requirements imposed by in O.C.G.A. § 9-10-91(3) therefore cannot be met.

In sum, personal jurisdiction cannot be exercised over Morbid, a nonresident of Georgia, under any of the applicable provisions of Georgia's long-arm statute. The Complaint should be dismissed accordingly.

### C. Dr. Amin's Claims Fail Because the Exercise of Jurisdiction Would Not Satisfy the Due Process Clause of the Fourteenth Amendment.

Even if the exercise of personal jurisdiction were appropriate under Georgia's long-arm statute, subjecting Morbid to jurisdiction in Georgia would violate the Due Process Clause of the Fourteenth Amendment. *Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 876 (11th Cir. 2018) (upholding dismissal for lack of personal jurisdiction where long-arm statute was satisfied but personal jurisdiction would violate due process).

The Due Process Clause protects a nonresident's liberty interest in not being bound to a judgment in a foreign state unless meaningful contacts with that foreign jurisdiction are first established. *Int'l Shoe Co.*, 326 U.S. at 319; *PVC Windoors, Inc. v. Babbitbay Beach Constr.*, 598 F.3d 802, 811 (11th Cir. 2010). The Eleventh Circuit has adopted a three-part due process-specific personal jurisdiction test which examines: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" itself of the privilege of conducting activities

within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Rowe*, 723 F. App'x at 876 (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).

As demonstrated in Section II above, Morbid has no ties to the state of Georgia. Morbid did not perform *any* acts in Georgia or transact business with, or otherwise contact any business or resident in, Georgia. Moreover, Georgia courts are clear that operating a website (which Wondery, not Morbid, does here) is insufficient to conclude that a defendant has purposefully engaged with the state. *See Pascarelli, 346 Ga. App. at 596-597*. Further, Dr. Amin has not otherwise alleged that Morbid has purposefully availed itself of the privilege of conducting activities in Georgia such that it could reasonably anticipate being haled into court there. *See Rowe*, 723 F. App'x at 876 (stating defendant must have "deliberately engaged in significant activities within [Georgia] or created continuing obligations with residents of that forum"). And finally, Dr. Amin does not allege – because he cannot – that Morbid specifically targeted the Georgia market or Georgia listeners. *See Kuykendall v. Amazon Studios LLC*, No. 5:20-CV-219, 2022 U.S. Dist. LEXIS 240966, at *28 (S.D. Tex. Mar. 18, 2022) (dismissing claims for lack of personal jurisdiction where "the…Podcast, like most podcasts, is accessible nationwide via the Internet. Plaintiff has not shown how the…Podcast specifically targeted the Texas market").

Given Morbid's absence of contact with Georgia, exercising personal jurisdiction over it in this action would not comport with the notions of fair play and substantial justice, and would violate due process. *See Kyte Centrifuge*, 2023 U.S. Dist. LEXIS 98505, at *15-18.

15

### III.   CONCLUSION

This Court lacks personal jurisdiction over Morbid under the Georgia long-arm statute, and subjecting Morbid to jurisdiction in Georgia would violate constitutional due process. On all the grounds established above, the Court should issue an Order dismissing the Complaint with prejudice.

Respectfully submitted this 31st day of May, 2024.

/s/ *Amanda D. Proctor*
Amanda D. Proctor
Georgia Bar No. 776848
CARLTON FIELDS, P.A.
1201 West Peachtree Street
Suite 3000
Atlanta, Georgia 30309
(404) 815-3400
(404) 815-3415 (fax)
aproctor@carltonfields.com

Peter Biagetti (pro hac application to be filed)
Daniel Goodrich (pro hac application to be filed)
Caroline Enright (pro hac application to be filed)
MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
(617) 542-2241 (fax)
pabiagetti@mintz.com
djgoodrich@mintz.com
cbenright@mintz.com

***Attorneys for Defendant Morbid: A True Crime Podcast LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk by using the CM/ECF system, which will send a notice of electronic filing to all registered users of the CM/ECF system. This 31st day of May, 2024.

                                                */s/ Amanda D. Proctor*
                                                Amanda D. Proctor